Joseph O'HARE, Albert M. Cornette, Peter Gale, Bruce A. McAllister, Robert M. Wanders and Thomas E. Moran, as Trustees of the New York Marine Towing and Transportation Industry Pension Fund and Insurance Fund, Plaintiffs,

v.

GENERAL MARINE TRANSPORT CORPORATION, Defendant.

No. 78 Civ. 6277 (RWS).

United States District Court, S.D. New York.

March 31, 1983.

---

**11.** *Cf.* 449 F.2d at 890; *Cicale,* 691 F.2d at 103.

**12.** *Cicale,* 691 F.2d at 104 (citation omitted).

Beck, Halberg & Williamson, Waldman & Waldman, New York City, for plaintiffs; Roman Beck, Seymour M. Waldman, New York City, of counsel.

Jared Stamell, Clifton, Budd, Burke & DeMaria, New York City, for defendant; Kevin J. McGill, New York City, of counsel.

## OPINION

SWEET, District Judge.

Here is yet another chapter in the annals of the conflict between the Berman family and Local 333, United Marine Division, International Longshoreman's Association, AFL–CIO ("Local 333"). The dispute started in the 1970's and gives every sign of continued vitality. The parties presently before the court are the plaintiff trustees of the New York Marine Towing and Transportation Industry Pension Fund and Insurance Fund (the "Trustees" or "Funds") and defendant General Marine Transport Corporation ("General Marine"), a subsidiary of the holding company owned by members of the Berman family.

The Trustees seek a determination of the amounts owed in accordance with the summary judgment granted by this court on December 4, 1981 which required General Marine to make payments for its employees for the period from 1976 to 1979. Both parties seek summary judgment on General Marine's counterclaim. Final judgment in favor of the Trustees and dismissing the counterclaim of General Marine will be entered in accordance with this opinion which constitutes findings of fact and conclusions of law.

Familiarity with the court's earlier opinion in this action and the opinions in related actions is assumed. After the December 4, 1981, 534 F.Supp. 120 opinion was filed, the Trustees discovered the books and records of General Marine, and after considerable delay, a one-day hearing was finally held on September 7, 1982 to resolve the amounts due in accordance with the earlier grant of summary judgment. Testimony was given by Eugene O'Connor ("O'Connor"), the Administrator of the Funds, Richard Siemerling ("Siemerling"), the auditor for the Funds, and Susan Frank ("Frank"), controller of General Marine. This was then followed on November 19, 1982 by argument on General Marine's motion for summary judgment on its counterclaim. By agreement of the parties, briefing was finally completed on or about February 18, 1983. Despite the wealth of past findings, certain facts should be restated as directly relevant to the present disposition.

In the mid-1970's Berman operated tugs, barges and tankers, and General Marine, a subsidiary of the family holding company, operated sludge vessels. Local 333 had unsuccessfully sought to organize Berman, but it was agreed prior to 1973 that the employees of General Marine would be covered by the collective bargaining agreement between Local 333 and the Marine Towing and Transportation Employers' Association (the "Association"). Berman used its employees interchangeably on all its vessels including the sludge vessels during the period covered by the 1973–76 industry-wide collective bargaining agreement and payments were made to the Pension Fund of $124,286.44 and to the Insurance Fund of $75,918.33 covering all Berman employees. General Marine was a party to the agreement. All the General Marine and Berman employees received whatever benefits accrued to them as a consequence of these payments.

In 1976 the Association and Local 333 entered into negotiations and an agreement was reached which purported to cover a "subsidiary company, an affiliated company or a company division in the Port of New York and vicinity." This provision and related events gave rise ultimately to Berman's antitrust litigation, *Berman Enterprises, Inc. v. Local 333*, 644 F.2d 930 (2d

Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981), and more immediately, to General Marine's repudiation of the 1976–79 collective bargaining agreement (the "Agreement") between the Association and Local 333. General Marine was struck, the strike was terminated, and on May 13, 1976 General Marine wrote to the Administrator of the Funds as follows:

Dear Mr. O'Connor:

In August, 1975, as Administrator of the Pension and Welfare Funds, you took the position that the benefits of Local 333 members employed by this company under the plans terminated because of a dispute about the effectiveness of the Association's contract with Local 333 and General Marine.

The effectiveness of the Association's contract with Local 333 upon General Marine Transport Corp. is again the subject of disputes and litigation between Local 333 and General Marine. General Marine wants to make pension and welfare payments for the Local 333 members employed by it, but in order to do so, we want the Trustees of the Pension and Welfare Funds to authorize the receipt of payments pending resolution of the disputes.

Very truly yours,

Peter M. Frank

Vice President

No reply was forthcoming.

In the fullness of time the NLRB concluded that Berman was entitled to a separate bargaining unit, Case No. 2–RM–1774, December 10, 1976, an election was held, and the Marine Engineers Beneficial Association ("MEBA") was elected as the bargaining representative for employees on Berman vessels. Local 333 then expelled the Berman employees. Berman and General Marine made no payments to the Funds and obtained coverage for their employees elsewhere. Local 333 complained to the NLRB of an unfair labor practice, the NLRB issued a complaint which the Second Circuit held on appeal to have been barred by the statute of limitations. *General Ma-*

*rine Transport Corp. v. NLRB,* 619 F.2d 180 (2d Cir.1980).

This action by the Trustees seeking recovery of pension fund contributions under the contract initially was brought as a counterclaim in the Berman antitrust suit. After the Trustees were dropped as defendants in that action, the counterclaim was severed from the antitrust suit and asserted through an independent complaint filed on December 29, 1978. Jurisdiction is predicated on section 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185, and Employee Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*

The 1976–79 Agreement provided in Article I, Section 16 for payment by the Employer to the Insurance Fund and Pension Fund "for each of his Employees in the bargaining unit" and also provided in subparagraph (d) as follows:

d. **Delinquent Employer.** If an Employer is delinquent for thirty (30) days in the payment of the contributions required of it under paragraphs "a" and/or "b" of this Section 16, the Administrator shall certify in writing to the delinquent Employer and to the Union the estimated delinquency due according to his records and the Union may terminate this agreement as to the delinquent Employer by mailing such Employer a notice to that effect by certified mail, which notice shall specify the date as of which the contract shall be so terminated. The Union will give such notice as its counsel may determine is required by law, if any, and if no notice is required by law, sufficient notice for the Employer to tie up its vessels in safety.

Thereupon, the contract shall terminate as to such delinquent Employer with the same force and effect as though the termination date set forth in the Union's notice was the date upon which this contract is to terminate with the said delinquent Employer.

Nothing contained herein, however, shall prevent the Union from immediately striking the said delinquent Employer

until all monies owed hereunder by the delinquent Employer are paid together with interest at 2% above the prevailing rate charged by CITICORP BANK to its prime customers from the date on which the contribution should have been paid; and if the Trustees incur legal expense in enforcing payment of such delinquent amount, the Trustees shall also be entitled to recover their reasonable counsel fees and other expense incurred in effecting collection. Such strike shall not violate the "no strike clause" and shall not be subject to the grievance and arbitration machinery of this contract.

In the event that the amount of delinquency alleged to be due by the Funds' Administrator is questioned by the Employer, the Employer may post a surety company bond in a form satisfactory to the Administrator or in lieu thereof, a cash deposit, for the amount certified by the Administrator of the Funds, in which event the Union shall not strike the delinquent Employer before the date of termination set forth in the aforesaid notice and the amount in dispute shall be resolved in accordance with the grievance and arbitration machinery of this contract.

The Agreement provides that it "applies only to all licensed and unlicensed Employees, employed on tugboats and self-propelled lighters owned or operated by the Employers ..."

General Marine contends that no damages are due because the Trustees have not complied with the notice provisions of the Agreement. Alternatively, General Marine asserts that the Trustees have overcharged General Marine in four major areas: (1) contributions to the insurance fund; (2) calculation of the hours paid; (3) the participation of captains; and (4) interest penalties.

The liability of General Marine for contributions to the Funds has already been determined by the prior opinion. However, that liability is now resisted on the ground that the notice required by Section 16 of the Agreement was never given. Overlooking the propriety of considering the issue at this time, I note that there is evidence that some notice was in fact given. The decision of the Administrative Law Judge, affirmed by the NLRB, stated:

On January 19, 1977, Local 333 wrote Respondent:

As you know, the U.S. Labor Board ruling effectively determined that this Union is the bargaining representative for the men employed on board your sludge vessels.

You have withheld pension insurance payments for these employees since last April during the pendency of the Labor Board case. We herewith demand that said payments be reinstituted, including all arrears with interest from their due date.

On February 11, 1977, Local 333's attorney wrote Berman and Respondent concerning delinquent pension plan contributions relating to the two companies stating:

As I advised you in today's telephone conversation, this letter is to make formal demand on behalf of the United Marine Division, Local 333, ILA, AFL–CIO and the New York Marine Towing and Transportation Industry Pension Fund for delinquent pension plan contributions for non-union members of the bargaining unit as well as bargaining unit employees from 1970 to date.

An immediate response from your clients is requested.

In addition, the filing of the counterclaim by the Trustees in the antitrust action certainly alerted General Marine to the Trustees' position.

General Marine elected to stand on its effort to terminate the Agreement entered by the Association on its behalf, and under such circumstances the Trustees were entitled to have the termination determined without notice setting forth the precise delinquency asserted. As the Administrator put it, "General Marine had ceased to be a contributing employer." The notice under such circumstances was a useless formality and indeed the Trustees had no basis upon which the delinquency could be stated. In

the face of General Marine's attempted withdrawal from the Association, the notice of deficiency was not a necessary condition to this action or the Trustees' recovery. To hold otherwise would be to ignore the realities of the posture of the parties during the period in question.

■ Further, regardless of the sufficiency of these acts to constitute notice under Section 16, when a party to a contract has both repudiated the agreement and purported to terminate it, without justification, then the other party need no longer satisfy the conditions that might otherwise be required of it. *See Craddock v. Greenhut Construction Co.,* 423 F.2d 111 (5th Cir. 1970); *Allegheny Valley Brick Co. v. C.W. Raymond Co.,* 219 F. 477 (2d Cir.1914); *Commercial Metals Co. v. International Union Marine Corp.,* 294 F.Supp. 570 (S.D.N.Y. 1968); 4 *Corbin on Contracts* § 977 (1951 and Supp.1982); 5 *Williston on Contracts* § 699 (1961); *Restatement (2d) Contracts,* § 255.

Under the 1976–79 Agreement establishing the Funds, the Trustees are granted the authority "to prescribe rules governing the amount to be contributed for Employees who do not work a full month, provided that such rules may not obligate an Employer to contribute more than a full monthly contribution ..." Under this authority the Trustees calculated the payments due by reason of persons employed on sludge vessels for less than 96 hours a month by totalling the hours of all employees who were paid for less than 96 hours in a particular month and dividing the aggregate figure by 96. The resulting number was added to the number of employees paid for over 96 hours to yield the total number of full contributions required to be made for that month.

■ The evidence adduced at the hearing established that General Marine had received communications from the Funds "to all contributing Employers" setting forth this method of calculation. The evidence also demonstrated that under the method utilized by Frank for General Marine, there were unjustifiable exclusions of employ-ment hours. The Trustees were empowered to prescribe regulations for employees paid for less than 96 hours a month, they exercised this power and communicated the procedures to all participating employers, and General Marine was aware of them. Under these circumstances, the Trustees' method of calculation for those having less than 96 paid hours in a month is proper.

The Trustees also adopted rules calling for payments on the basis of "hours paid for," rather than hours worked, a difference which is significant because of the General Marine practice of paying their employees for each hour on the boat, whether or not on duty. The General Marine employees worked one week on, one off and received no overtime or weekend benefits. General Marine urges that a calculation on the basis of a 12-hour day, which would reduce the monies owed by General Marine by $2,054.52, is the appropriate measure since it accords with the treatment given other members of the Association. However, this position overlooks certain differences between General Marine's operations and those of other Association members. Again, a uniform procedure is prescribed by the Trustees and that procedure requires contributions for all hours paid for. General Marine's alleged miscalculation in the past is no justification for miscalculating the contributions presently due.

General Marine asserts that it should not be required to make contributions for captains. Its argument is as follows: section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), requires that the contributions be used for the "sole and exclusive benefit of the employees"; the term "employee" in LMRA § 302(c)(5) is defined by LMRA § 501(3), 29 U.S.C. § 142(3), which refers to the definition in section 2(3) of the National Labor Relations Acts ("NLRA"), 29 U.S.C. § 152(3); NLRA § 2(3) defines "employee" as excluding "any individual employed as a supervisor"; captains are "supervisors" within NLRA § 2(11), 29 U.S.C. § 152(11); therefore, "employees" under LMRA § 302(c)(5) does not include "supervisors," or in this case, captains.

Courts have rejected such a literalistic and automatic application of the NLRA definitional provisions to the various provisions of the LMRA. *See, e.g., Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); *United States v. Ryan,* 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 335 (1956); *Crilly v. Southeastern Pa. Transp. Authority,* 529 F.2d 1355 (3d Cir.1976); *United States v. National Marine Engineers' Beneficial Ass'n,* 294 F.2d 385 (2d Cir.1961). Specifically, several courts have held that the "supervisor exclusion" of NLRA § 2(3) is inapplicable to other provisions of the LMRA, *see, e.g., Reiherzer v. Shannon,* 581 F.2d 1266 (7th Cir.1978), and that the exclusion was meant to apply only to provisions of the NLRA, *see, e.g., District 2, Marine Engineers Beneficial Ass'n v. Amoco Oil Co.,* 554 F.2d 774 (6th Cir.1977); *Isbrandtsen Co. v. District 2, Marine Engineers Beneficial Ass'n,* 256 F.Supp. 68 (E.D.N.Y.1966).

■ Based on these authorities, I conclude that the payments due include contributions for captains. It should be noted that Frank testified that over the many years that General Marine made payments to the Funds until April 1, 1976, it always paid for captains. General Marine clearly understood that payments for captains were required under the collective agreements to which it was a party.

■ Pursuant to section 502(g) of ERISA, 29 U.S.C. § 1132(g)(2), the Trustees are also entitled to double interest on defendant's delinquent contributions. 29 U.S.C. § 1132(g)(2) provides:

(g)(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions

(C) an amount equal to the greater of—

  (i) interest on the unpaid contributions, or

  (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.  ·

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under Section 6621 of Title 26.

29 U.S.C. § 1145 provides:

§ 1145. Delinquent contributions. Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such a plan or such agreement.

The so-called "double-interest" remedy derives from the combination of subsections (B) and (C)(i) of 29 U.S.C. § 1132(g)(2). *Central States, Southeast and Southwest Areas Pension v. C.J. Rogers Transportation Co.,* 544 F.Supp. 308, 313 (E.D.Mich. 1982); *Central States, Southeast and Southwest Areas Pension Fund v. Alco Express Co.,* 522 F.Supp. 919, 921 n. 2 (E.D.Mich. 1981). The rate specified in section 16(d) of the Agreement quoted above is 2% above the Citicorp prime rate. General Marine's argument that the interest provision in the Agreement is limited to those situations in which the union chooses to exercise its right to strike is unpersuasive. The entire paragraph deals with the remedies available in the case of employer delinquency, including interest.

Several cases have held the interest and attorneys' fees requirements of the ERISA amendments of 1980 to section 502(g), Pub.L. No. 96–364, § 306(b)(2), 94 Stat. 1295 (amending 29 U.S.C. § 1132(g) (1976)),

applicable to payments of contribution delinquencies which preceded enactment of the statute. In *Alco,* the first case to fully treat the question, the trustees sought the double interest and attorneys' fees mandated by section 502(g), following a summary judgment adjudicating the employer's liability for unpaid contributions in the period April 1, 1976 to March 31, 1978. As in the instant action, during the pendency of the suit for contributions, the 1980 amendments to ERISA became effective. The trustees urged that the provisions of section 502(g) applied and the court, after well-reasoned analysis, agreed. The court held:

The double interest proviso of the 1980 amendments must likewise be given retroactive effect, making it applicable to cases pending on its effective date. As the Court has already described, Congress clearly intended this provision to be remedial; it arose out of an acute concern over the adverse impact of delinquencies on employee benefit plans and was intended to discourage failure to make payments when due. Congress was aware that in some instances there might be a legitimate dispute over the exact amount currently owing, but determined in all instances of delinquencies to require payment of double interest as compensation for the damage occasioned by the failure of a trust to receive payments as due. Importantly, Congress did not arbitrarily choose double interest as the amount due but rather listed it as an alternative: Section 502(a) requires that the court award the greater of double interest on the amount specified in the agreement of the parties up top 20% of the amount of delinquent contributions.

522 F.Supp. at 930–931 (citations omitted).

The *Alco* approach to section 502's remedial provisions has been followed in *San Pedro Fishermen's Welfare Trust Fund Local 33 v. DiBernardo,* 664 F.2d 1344 (9th Cir.1982), *Central States, Southeast and Southwest Areas Pension v. C.J. Rogers Transportation Co.,* 544 F.Supp. 308, 312 (D.Mich.1982), and *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025, 1045 n. 37 (D.Ill.1982). General Marine relies on

*Hammond v. James W. Griffin Co., Inc.,* 520 F.Supp. 162 (N.D.Ga.1981), in which the court declined to apply the 1980 amendments to a case commenced prior to their enactment. *Id.* at 168. In light of the dearth of analysis in that decision and based on the authorities set forth above, I conclude that retroactive application is appropriate here and that General Marine has not demonstrated that application of the double-interest provision will work a "manifest injustice."

Parenthetically, it should be noted that General Marine asserts that the penalty interest rate provision under ERISA may not be considered because the provision was not cited in the Trustees' complaint and because its application was not anticipated by General Marine. However, this action was brought under the LMRA and ERISA, and in connection with the liability and damages issues, both parties have based a number of arguments on ERISA. The Trustees specifically cited section 502 of ERISA, 29 U.S.C. § 1132, in their motion papers on the liability question, pointing out that the section "deals with defaults in employer contributions to employee benefit funds." In its motion for summary judgment against the Trustees on liability, General Marine *itself* requested relief pursuant to 29 U.S.C. § 1132(g). As was the case in *Central States, Southeast and Southwest Areas Pension v. C.J. Rogers Transportation Co.,* 544 F.Supp. 308, 309 (E.D.Mich. 1982), the Funds have sued to collect unpaid contributions under ERISA, 29 U.S.C. § 1001 *et seq.,* and having previously found that the Funds are entitled to the contributions, I must award the remedy sought for General Marine's failure to make payments, a remedy authorized by § 1132(g)(2) of ERISA. *See id.* at 312.

No authority has been advanced by General Marine to support its proposition that a collective bargaining agreement should not be enforced because it would require the non-contributing employer to pay twice—as indeed General Marine will be required to do here. In a period when choices were difficult and conflicting, General Marine in

this court's view made the wrong choice and must now suffer the penalty for its ineffective withdrawal from the Association. The undeniable windfall to the Trustees results from the terms of the Agreement and the authorities as they are understood by the court, *see Brogan v. Swanson Painting Co.,* 682 F.2d 807 (9th Cir.1982); *Audit Services, Inc. v. Rolfson,* 641 F.2d 757 (9th Cir.1981); *Local 9, International Union of Operating Engineers v. Siegrist Construction Co.,* 458 F.2d 1313 (10th Cir.1972). General Marine's contractual obligations to the fund cannot be extinguished by its own unilateral arrangements for other forms of insurance coverage or even the payment of claims under that coverage. Indeed, as the Trustees point out, such a defense would render the Act and collective bargaining agreements toothless.

The General Marine counterclaim seeks repayment from the Trustees for the contributions made for Berman employees during the 1973–76 period. There is no question but that payments were made and the parties do not dispute the amount of the payments. The only question is whether they were properly made by General Marine and accepted by the Funds.

General Marine relies on *Moglia v. Geoghegan,* 403 F.2d 110 (2d Cir.1968), *cert. denied,* 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969), and subsequent decisions applying *Moglia,* which hold that under section 302 of the LMRA, 29 U.S.C. § 186(c)(5)(B),[1] an employee benefit fund may not accept contributions from an employer unless that employer is party to a written document specifying the basis of contributions. General Marine argues that it is entitled to restitution under *Moglia* because the Regional Director found that the employees on Berman vessels constituted a separate bargaining unit and because Berman was not a party to the 1973–76 collective bargaining agreement.

The Regional Director determined that there was no contract bar to an election among the tug and barge employees. The "contract bar" doctrine is used by the NLRB for representation election purposes and General Marine has not presented authority for extending its application to issues concerning section 302 of the LMRA.

Moreover, General Marine's payment for the Berman employees and the Fund's acceptance of the contributions at issue do not contravene the principles set forth in *Mog-*

---

1. 29 U.S.C. § 186(c)(5) states in relevant part:

(c) The provisions of this section shall not be applicable ... (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, families, and dependents jointly with the employees of other employers making similar payments, and their families and dependents): Provided, That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, together with such neutral per-

sons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such deadlock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in the event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the fund held therein cannot be used for any purpose other than paying such pensions or annuities; ...

*lia. Moglia* involved a claim to a pension trust fund by the widow of an employee of an employer who had for many years contributed to the fund on behalf of its employees. The trustees of the fund denied the claim and attempted to return those contributions made by the employer, the trustees having discovered that the employer had never entered into a collective bargaining agreement or pension trust with the union.

■ This is not a suit arising out of a denial of benefits by the trustees. Here contributions were made by General Marine, a party to the collective bargaining agreement, those contributions were accepted, benefits were provided, and pension credits were earned even to the point of vesting. Every month, General Marine submitted written, signed reports to the Trustees, showing the employees for whom employment contributions were made. All such employees were on the General Marine payroll, not the payroll of any other company. The work performed by these employees aboard tugs and barges was the very work covered by the collective bargaining agreement which provided coverage to employees on vessels "owned or operated by the Employers" in the Port of New York and vicinity. To the extent that General Marine employees worked aboard the tugs and barges, General Marine may be said to have "operated" the vessels for collective bargaining agreement purposes. Berman and General Marine interchanged moneys, vessels and employees. *See Berman Enterprises, Inc. v. Local 333,* 644 F.2d 930, 936 (2d Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 381 (1981), ("there was in reality but a single employer, with interrelated operations, common management, and centralized control of labor relations …"). Under these circumstances,

*Moglia* is satisfied by the 1973–76 collective bargaining agreement.

General Marine also argues that the retention by the Funds of contributions made on behalf of the employees on Berman vessels contravenes section 302(c)(5) of the LMRA, 29 U.S.C. § 186(c)(5), which provides that moneys paid to a trust fund by an employer must be "for the sole and exclusive benefit of the employees of such employer." General Marine contends that section 302(c)(5) requires that a voluntarily departing group be permitted to take a portion of the fund with them, either through direct repayment of contributions or through segregation of assets to be administered under a new set of eligibility rules tailored to that particular group.

General Marine relies primarily upon *Alvares v. Erickson,* 514 F.2d 156 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106 (1975), in which employers together with their employees withdrew from a bargaining unit and trust fund. The suit was brought as a class action by members of the local, seeking an allocation or transfer of that portion of uncommitted reserves attributable to contributions made by employees on behalf of the local's members prior to withdrawal. The district court dismissed the case for lack of jurisdiction and the Ninth Circuit reversed, holding that there was jurisdiction under sections 301(a) and 302(e) of the LMRA, 29 U.S.C. §§ 185(a)[2] and 186(e).[3] The court "express[ed] no opinion as to the merits of plaintiff's claim[s]." 514 F.2d at 167. However, the Ninth Circuit noted that jurisdiction under section 302(e) had been found by courts in actions involving "structural" deficiencies in the relevant trust, deficiencies which caused the trusts to violate the "sole and exclusive benefit" provision of section 302(c)(5), and not in cases involving

---

**2.** 29 U.S.C. § 185(a) reads as follows:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties,

without respect to the amount in controversy or without regard to the citizenship of the parties.

**3.** 29 U.S.C. § 186(e) states in relevant part: The district courts of the United States … shall have jurisdiction, for cause shown, … to restrain violations of this section …

only questions of day-to-day fiduciary administration of welfare and pension funds. The *Alvares* court went on to find that the claim before it was a "structural" matter and therefore that jurisdiction existed.

Even if I were to interpret the *Alvares* decision as one going beyond the jurisdictional question, that is, as suggesting that the plaintiffs' claim was meritorious, the facts there are distinguishable from those in the case at bar. In *Alvares*, a substantial number of the employer parties to the trust had withdrawn. Those employers and their employees agreed to set up a new trust. There was some indication that the trustees of the prior trust had forfeited certain credits of the employees who left. The Ninth Circuit concluded that these changes and others involved "a rather drastic change in [the prior trust's] structure." *Id.* at 165.

Here, General Marine was not one of many employers who with their employees withdrew and agreed to set up a new trust. After March 31, 1976, the employees in question elected a new bargaining representative, but General Marine itself, as previously found by this court, did not cease to be a covered employer. When the contributions by General Marine for sludge boat employees through March, 1979 are made, the Trustees assert that the employees whose employment generated such payments will receive appropriate pension credit for the 1976–79 period.

General Marine has not demonstrated that there will be a loss or forfeiture of benefits under these circumstances. As made clear in the affidavit of Eugene O'Connor, Administrator of the Funds, the Berman employees whose employment generated the contributions in question received full coverage and credit to which they were entitled. The employees received full entitlement to benefits based on General Marine's payment to the Insurance Fund for the entire 1973–1976 period for which payments were made. Their membership or non-membership in Local 333 had no bearing on that entitlement. The expelled employees received pension credit for the periods for which contributions were made. The pension credit has not been extinguished or impaired. Some of the expelled employees are fully vested, others are close to vested status and may achieve it, and all remain fully credited for and service earned and contributed for prior to April 1, 1976.

■ Although I conclude that section 302(c)(5) does not require transfer or segregation of contributions in this case for the reasons set forth above, I note that General Marine has not indicated how as an employer it even has standing to claim that contributions should be paid into a trust administered for the benefits of the expelled employees. Also, General Marine has argued that based on section 403(c)(2)(A)(ii) of ERISA, 29 U.S.C. § 1103(c)(2)(A)(ii),[4] which permits an employer who made contributions to a "multiemployer plan by a mistake of fact or law ..." to obtain a refund of such contributions, General Marine is entitled to restitution. According to General Marine, the "mistake of fact or law" here is that contributions were made in violation of 29 U.S.C. § 186(c)(5). However, having found no such violation, section 403(c)(2)(A)(ii) of ERISA provides no basis for restitution.

---

4. 29 U.S.C. § 1103(c)(2)(A)(ii) provides as follows:

(c)(1) Except as provided in paragraph (2), (3), or (4) or subsection (d) of this section, or under section 1342 and 1344 of this title (relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

(2)(A) In the case of a contribution, or a payment of withdrawal liability under part 1 of subtitle E of subchapter III of this chapter—...(ii) made by an employer to a multiemployer plan by a mistake of fact or law (other than a mistake relating to whether the plan is described in section 401(a) of Title 26 or the trust which is part of such plan is exempt from taxation under section 501(a) of Title 26), paragraph (1) shall not prohibit the return of such contribution or payment to the employer within 6 months after the plan administrator determines that the contribution was made by such a mistake.

The amount of damages awarded to the Funds are to be determined in accordance with this opinion and for the reasons stated above, General Marine's counterclaim is dismissed.

Submit judgment on notice within ten (10) days.

IT IS SO ORDERED.